R. Rex Parris, Esq. (SBN 096567)
 rrparris@rrexparris.com
Alexander R. Wheeler, Esq. (SBN 239541)
 awheeler@rrexparris.com
Patricia K. Oliver, Esq. (SBN 193423)
 poliver@rrexparris.com
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:      (661) 949-2595
Facsimile:      (661) 949-7524

Don Howarth, Esq. (SBN 53783)
dhowarth@howarth-smith.com
Suzelle M. Smith, Esq. (SBN 113992)
ssmith@howarth-smith.com
Jessica L. Rankin, Esq. (SBN 279237)
jrankin@howarth-smith.com
**HOWARTH & SMITH**
523 West Sixth Street, Suite 728
Los Angeles, California, 90014
Telephone:      (213) 955-9400
Facsimile:      (213) 622-0791

David S. Casey, Jr., Esq. (SBN 60768)
dcasey@cglaw.com
Gayle M. Blatt, Esq. (SBN 122048)
gmb@cglaw.com
Jeremy Robinson, Esq. (SBN 188325)
jrobinson@cglaw.com
Jason C. Evans, Esq. (SBN 272932)
jevans@cglaw.com
**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP**
110 Laurel Street
San Diego, California 92101
Telephone:      (619) 238-1811
Facsimile:      (619) 544-9232

Attorneys for Plaintiff and the putative class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LUIS GARNICA, CORA POTTER, individuals; and on behalf of themselves and a class of similarly situated consumers,<br>         Plaintiffs<br>v.<br><br>HOMETEAM PEST DEFENSE, INC., a Delaware corporation, ROLLINS, INC., and DOES 1 through 100, inclusive,<br>         Defendants, | CLASS ACTION<br><br>Case No.: 14-cv-05243-VC<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT** |

**NATURE OF ACTION**

1.      This is an antitrust action against HomeTeam Pest Defense, Inc. ("HomeTeam") and Rollins, Inc., to enforce section 2 of the Sherman Antitrust Act of 1890 ("Sherman Act").  Plaintiffs bring this action on their own behalf and seek to represent all similarly situated persons with a tube-in-the-wall pest control system who paid monopolistic prices for pest control servicing by HomeTeam between November 26, 2010 through the date of trial of this action (the "Class Period").

2.      HomeTeam (and its predecessor) install tube-in-the-wall pest control systems directly into the walls during construction of new homes.

3.      Tube-in-the-wall pest control systems (called "Taexx" by HomeTeam)  distribute pesticide directly in wall voids and thus kill common household pests where they live and breed. Tube-in-the-wall pest control provides an unparalleled ability to control household pests including termites, bed bugs, cockroaches, and ants.



4.      This unique system feeds to a panel on the home's exterior for servicing.  Any licensed pest control technician should be able to inject pesticides into the tube-in-the-wall system.

5.       HomeTeam, however, takes every step needed to block competitors from servicing all tube-in-the-wall systems installed by HomeTeam or its predecessor.  HomeTeam deliberately set out to control the installation market for tube-in-the-wall systems by, among other items, blocking any other company from installing tube-in-the-wall pest control systems.

6.      HomeTeam then leveraged its control of the installation market to monopolize nearly 100% of the servicing market for tube-in-the-wall systems.

7.      HomeTeam's anticompetitive conduct includes the installation of a locking port cover to prevent anyone (including the homeowners) other than HomeTeam from servicing the tube-in-the-wall system.  HomeTeam also tells homeowners that servicing by any other company can damage the system and will void the warranty on the system.  Further, HomeTeam threatens to sue and sues any company that dares to offer servicing for the system at a lower price.

8.      As a result of HomeTeam's actions, Plaintiffs and the putative class members pay supracompetitive prices to HomeTeam for servicing of the tube-in-the-wall systems.

**I.      Background**

9.      On May 7, 1990, the inventor of the tube-in-the-wall pest control system sought and obtained a patent for the installation of flexible tubing into the walls of a building (similar to the installation of electrical wires).  This tubing could then be used to distribute pesticides directly into wall voids where bugs live and breed.

10.      The inventor thereafter assigned the patent to Environmental SafetySystems, Inc. ("ESSI").

11.      In 1993, ESSI began franchising the tube-in-the-wall system to other pest control companies.

12.      By 1996, ESSI had developed a successful business model and sold its rights to the tube-in-the-wall system to Centex Homes for upwards of $32 million.

13.      Centex consolidated most, if not all, of the previous franchisees and began operating the tube-in-the-wall pest control business under a new company name (HomeTeam Pest Defense, LLC).

14.      From 1996 until 2008, HomeTeam (under its prior LLC status) installed tube-in-the-wall systems into homes built by Centex as part of a standard tract home feature.

15.      During this time period, HomeTeam would seek to service the tube-systems installed previously by franchisees and also in the newly built homes.

16.      Until July 31, 2007, HomeTeam owned a patent on the design of the integrated tube-in-the-wall system and thus enjoyed a patent-protected monopoly on the installation market for these systems.

17.      HomeTeam, however, did not have any patent or a lawful monopoly on the secondary market for servicing of tube-in-the-wall pest control systems.

18.      HomeTeam instead leveraged its monopoly power in the primary installation market and took other anticompetitive steps to monopolize the secondary service market – a market with even more financial benefits due to consistent income from monthly service contracts.

2

1    19.    As explained in more detail below, HomeTeam threatened to sue – and actually sued

2    any company that attempted to service customers with the tube-in-the-wall pest system.

3    20.    HomeTeam wrongfully claimed that any such service infringed on a patent.

4    21.    HomeTeam also falsely claimed it owned the tube-in-the-wall systems, and thus

5    competitors were not allowed to service the tube-in-the-wall systems.

6    22.    The locking port, however, is part of the system installed on Plaintiffs' homes, and

7    Plaintiffs paid for the system, including the locking port cover, as part of the price of their homes.

8    23.    Within days of one of HomeTeam's first sham lawsuits to stop its competitors

9    (*HomeTeam Pest Defense, LLC v. Platinum Pest Services, Inc.* (Case No. 6:04-cv-689-Orl-28JGG)

10   filed in Florida on May 10, 2004), HomeTeam also applied for and later obtained a patent for a

11   special locking port cover.  The application stated that it was designed to lock out competitors and

12   provide evidence if anyone other than HomeTeam serviced the system.

13   24.    HomeTeam insured that every tube-in-the-wall system installed afterwards contained

14   a locked port cover – and HomeTeam had the only key.  Not even homeowners received a copy of

15   the key.  The locking port includes a label with HomeTeam's name,

16   followed by its phone number, and then a notice to the homeowner

17   that said "Damage caused by unauthorized service is not covered by

18   warranty."



19   25.    In trying to obtain any business from these

20   homeowners, HomeTeam's competitors had to then explain why they

21   had the ability and could properly service the system *without* a key to

22   the tube-in-the-wall system.

23   26.    The new pest control company usually had to drill off

24   the locked port and remove it from the exterior of the customer's

25   house (see picture of port after removal).  New ports would then be installed on the outside of the

26   home to allow any company to service the system.

27   27.    HomeTeam further misled homeowners by making representations that servicing by

28   another company would damage the system, and voiding all lifetime warranties for workmanship if

3

any other company serviced the system.  HomeTeam made these misrepresentations knowing there was no evidence any other service provider had ever damaged any tube-in-the-wall system.

28.  On March 27, 2007, just months before the expiration of HomeTeam's patent for the tube-in-the-wall system, HomeTeam submitted an application to trademark the tube-in-the-wall pest control system under its current name "Taexx."

29.  With the trademark registration in hand, HomeTeam threatened trademark infringement lawsuits against its competitors who tried to service the tube-in-the-wall systems.

30.  HomeTeam succeeded beyond imagination.  In 2008, HomeTeam was the third largest residential pest control provider in the country.

31.  Seeing this growth, the largest pest control company in the world – Rollins, Inc. ("Rollins") – expressed interest in 2007 in acquiring the HomeTeam monopoly.

32.  Rollins is well known for its longstanding brand of pest control offered under the Orkin name.

33.  In April of 2008, Rollins paid Centex $137 million to acquire HomeTeam. HomeTeam now began operating as a corporation rather than a limited liability company.

34.  Rollins told its shareholders that the acquisition of HomeTeam's 400,000 customers gave them the exclusive ability to service tube-in-the-wall pest control systems.

35.   Rollins and HomeTeam then devised a new strategy to undercut any remaining competitors in the installation market and use HomeTeam's dominance to monopolize the servicing market.

36.  Backed by Rollins, HomeTeam installed tube-in-the-wall pest control systems below cost.  HomeTeam dropped the price of tube-in-the-wall installation from $225 per home in Bakersfield, to $75, and in some cases, no cost whatsoever.

37.  Through these below cost sales, HomeTeam was able to drive all competition out of the installation market and then leverage its power in that market to monopolize the secondary service market.

38.  In addition, as the only installer of the tube-in-the-wall system, HomeTeam received exclusive information about the new homeowners and persuaded the builders to assist in making

4

sure HomeTeam obtained the servicing contracts from the new homeowners.

39.     HomeTeam also continued its aggressive strategy of removing all potential competitors.  HomeTeam used threats of patent infringement and treble damage lawsuits if competitors did not stop servicing tube-in-the-wall systems at less than HomeTeam charged.

40.     HomeTeam succeeded in preventing nearly all homeowners with tube-in-the-wall pest control systems in the US from using any tube-in-the-wall service provider other than HomeTeam.

41.     HomeTeam now controls nearly 100% of the market for servicing tube-in-the-wall pest control systems.

42.     As a result of these actions, HomeTeam unlawfully stifled competition, created and maintained an unlawful monopoly, reduced consumer choices, and increased prices in the servicing of tube-in-the-wall systems significantly above the non-monopoly competitive price.

**PARTIES**

43.     Plaintiff Jose Garnica ("Garnica") is an individual residing in Fresno, California.

44.     Plaintiff Cora Potter ("Potter") is an individual residing in Bakersfield, California.

45.     Defendant HomeTeam is a pest control company doing business in this judicial district, elsewhere in California, and the United States.  HomeTeam specializes in a providing a unique form of pest control through the tube-in-the-wall system.

46.     Defendant Rollins is the owner of HomeTeam and a pest control company doing business in this judicial district, elsewhere in California and the United States.  Rollins provides support for HomeTeam's business activities including its business plan to install tube-in-the-wall systems below cost and recouping those costs from consumers by monopolizing the market for servicing of tube-in-the-wall systems.

47.     Defendants, Does 1 through 100, inclusive, are sued herein under fictitious names.  Their true names and capacities are unknown to Garnica or Potter ("Plaintiffs") at this time.  When their true names and capacities are ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities herein. Plaintiffs are informed and believe and therein allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein

5

alleged, and that Plaintiffs' damages as herein alleged were proximately caused by such Defendants.

<u>**FACTUAL ALLEGATIONS**</u>

**A.      Named Plaintiffs**

48.      On or about August 4, 2009, Mr. Garnica's family purchased a home built by Centex Homes that included a tube-in-the-wall system installed by HomeTeam prior to the purchase. HomeTeam installed a locked port preventing any other company from servicing the tube-in-the-wall system, and in accordance with company policy, HomeTeam did not give Mr. Garnica's family a key to the port.  It was the only key not provided when they moved into their home.

49.      Mr. Garnica retained HomeTeam shortly after moving into his home to service the tube-in-the-wall system because HomeTeam appeared to be the only company authorized to service this system.  The locking port included a label with HomeTeam's name, followed by its phone number, and then a notice to the homeowner that said "Damage caused by unauthorized service is not covered by warranty."

50.      Around the time of Mr. Garnica's purchase of tube-in-the-wall pest control servicing, HomeTeam form agreements provided for a twelve month period of service.  (<u>See</u>, <u>e.g.</u>, Exhibit 17.) Thereafter, the contract would renew annually for an additional twelve months.  It was Mr. Garnica's understanding that he could cancel and did cancel servicing in 2014.   HomeTeam generally called Mr. Garnica to schedule bi-monthly service and confirm he locked up the dogs before the service.

51.      Mr. Garnica understood that HomeTeam could increase price for servicing.  Mr. Garnica recalls the notice being in the actual increased charge on his account with HomeTeam.

52.      For example, by March, 2010, HomeTeam was charging Mr. Garnica $68 per service. By November 2012, HomeTeam was charging Mr. Garnica $71 per service.  And in September 2013, HomeTeam charged Mr. Garnica $73.80 per service.

53.      In 2014, HomeTeam's sister company (Orkin, which is a subsidiary of Defendant Rollins) took over the servicing of Mr. Garnica's tube-in-the-wall system, charging him $73.80 per month.  Mr. Garnica paid this sum up to August of 2014, just prior to the filing this complaint.

54.       On or about September 2012, Ms. Potter purchased a home built by Centex Homes that included a tube-in-the-wall system installed by HomeTeam prior to the purchase.  HomeTeam

installed a locked port covers preventing any other company from servicing the tube-in-the-wall system, and in accordance with company policy, HomeTeam did not give Ms. Potter a key to the port.  It was the only key not provided when she moved into her new home.

55.    On or about October of 2012, shortly after moving into her home, Ms. Potter retained HomeTeam to service the tube-in-the-wall system because HomeTeam appeared to be the only company authorized to service this system.

56.    Ms. Potter paid HomeTeam $68 per service. Ms. Potter continued to pay HomeTeam and later Orkin until a short time ago when she cancelled the service.

**B.    Conventional Chemical Pest Control**

57.    Conventional pest control usually takes one of three forms: biological pest control, physical pest control, and chemical pest control.

58.    Biological pest control is the introduction of a predator or parasitic species to a particular habitat so that the predator or parasite will kill the pest species.

59.    Physical pest control is the introduction of a physical boundary that provides a protective barrier between the pest and the building or plant to be protected or a physical device that terminates the pest.

60.    Chemical pest control is the application of pesticides in or around a home or field in order to kill unwanted pests by introducing a substance into the pest or in contact with them.

61.     The most common forms of chemical pest control are fumigation and spraying.

62.    Fumigation requires that a pest control company fill the entire building with gaseous pesticides or fumigants, with the purpose of suffocating or poisoning the pests within the home. First, the building is covered by a tent or large tarp in order to prevent the fumigants from escaping from the desired location.  Next, the fumigant is released into the controlled environment and held for a set period of time while the fumigant percolates through the space and walls, and suffocates or kills the pests.  Then, the space is ventilated and rendered safe for humans to enter.

63.    Spraying requires a pest control company or homeowner to introduce a chemical pesticide into areas inside and outside the home, including in particular points of ingress for pests. The chemicals will kill pests already present and serve as a temporary chemical deterrent to new

7

pests entering the home.  The spray is typically distributed by an individual using a spray can or device and manually walking through the interior or exterior of the home.  Each time the spray is used, the individual must physically distribute the spray.  The spray is directed by the individual, and the individual chooses where the spray will go.  If the individual misses a point of ingress or does not adequately cover a necessary area, the spray does not affect or deter pests in that area.

64.     Bugs live and breed in wall voids, and thus spraying of pesticides outside the walls will not kill bugs where they live and breed.  Further, the spray cannot be distributed inside the walls of the home, it must be sprayed either inside or outside the home, or at points of ingress.

65.     Fumigation and spraying, as described above, are conventional pest control methods, referred to herein as "conventional chemical pest control."

**C.     Tube-In-The-Wall Pest Control**

66.     Tube-in-the-wall systems represent a fundamentally different approach relative to conventional chemical pest control.

67.     Tube-in-the-wall pest control systems are built in to the physical structure of the building. The system consists of small tubes running through the walls of a building like electrical wires.  The tubes are installed during the construction of the house. Once construction is complete, the system cannot practically be installed.



68.     The tubes are thinner than a pencil with small perforations every 12 inches.  The tubes feed to a panel (or port) on the exterior of the home.

69.     A pest control technician can then inject EPA-approved pesticides into the tubes through the exterior port.  A fine mist of pesticides goes through the tubes and out of the perforations into the wall voids.  By keeping the chemicals behind the walls, the pesticide goes into the wall

1   voids where most bugs live.

2       70.    Among other advantages, the tube-in-the-wall system alleviates concerns that

3   treatments will harm children and pets because the pesticide is injected only into the walls.  Upwards

4   of 80% of consumers believe this is a high priority.

5       71.    By contrast, there is no "installation" of conventional chemical pest control, as there

6   is no physical mechanism to install.

7       72.    In addition, tube-in-the-wall systems

8   are serviced by injecting the chemicals into a central

9   port (see photo), rather than requiring an individual to

10  manually distribute the chemicals around the house or

11  to erect a tent around the home for fumigation.



12      73.    Tube-in-the-wall systems also allow

13  the chemicals to spread within the walls of the home,

14  whereas conventional chemical pest control can only access the outside of the building and the

15  interior of the home.  Conventional chemical pest control cannot reach inside the walls.  Thus, there

16  are physical requirements to a tube-in-the-wall system that conventional chemical pest control does

17  not require.

18      74.    Tube-in-the-wall systems provide a fail-safe, simple method of pest control within the

19  walls of a building that differs from conventional spraying and fumigation.

20      75.    Tube-in-the-wall systems also involve an upfront capital investment in the pest

21  control method, whereas conventional chemical pest control does not.

22      76.    Indeed, HomeTeam itself defines the tube-in-the-wall system as distinct from

23  conventional chemical pest control in virtually all of its noncompetition agreements and

24  purchase/sale agreements with other pest control providers.  (See, Exhibits 3, 12, 14, and 15.)

25      77.    Further, in 2008, Rollins' CEO described the tube-in-the-wall system as a "new

26  business channel" distinguishing it from all other pest control services provided by Rollins.

27  HomeTeam has stated that tube-in-the-wall systems are "superior" and "a unique service."  (See,

28  e.g., Exhibit 12.)  HomeTeam's President stated in 2013, "We all know that the [tube-in-the-wall

9

system] product separates us from our competitors."

78.     HomeTeam's own market research confirmed that customers do not believe tube-in-the-wall pest control servicing is the same as conventional chemical pest control.  62% of HomeTeam customers with tube-in-the-wall systems installed in their homes have gone on to purchase servicing from HomeTeam.  The remaining 38%, according to HomeTeam's research, are comprised of 20% who are "not concerned about pests in their home" and 18% that find home remedies sufficient to rid their homes of pests.  In other words, HomeTeam's market research shows that if customers have tube-in-the-wall systems installed in their homes, then they generally do not choose to use conventional chemical pest control in lieu of having their tube-in-the-wall systems serviced.  This strongly suggests that that these two forms of chemical pest control represent separate and distinct economic markets.

79.     Additionally, another market research study conducted by HomeTeam concluded that when a tube-in-the-wall system was installed in a new home, the homeowner's "perceived average value" of the home was roughly $800 more than if the system was not present. This would not be the case if consumers viewed the tube-in-the-wall system as interchangeable with conventional pest control methods.

80.     There are more differences, including:

    a.   **Effectiveness** – tube-in-the-wall pest control is nearly 100% effective because it kills bugs inside the wall where they live.  The pesticides also last up to six times longer than conventional spraying because the pesticide is injected into the wall voids where there is no sunlight that causes pesticides to evaporate.  Conventional spraying does not offer any of these attributes and requires more frequent application of pesticides.

    b.   **Cleanliness** – tube-in-the-wall pest control is cleaner than conventional chemical pest control because there are no lingering odors, and is nothing sprayed on carpet, drapes, furniture or baseboards.  Thus, the house remains clean and does not sustain any damage during the servicing of the tube-in-the-wall system.

    c.   **Safety** – tube-in-the-wall pest control is safer than conventional chemical pest

1   control because the pesticide is put into the wall voids.  There is never any direct

2   contact between the pesticide and the people or animals inside the house.

3   Conventional chemical pest control leaves pesticides in living areas.  Thus,

4   children and pets are more likely to be exposed to pesticides that are sprayed in a

5   conventional manner.

6      d.   **Convenience** – tube-in-the-wall pest control is more convenient than

7   conventional chemical pest control because service technicians can service the

8   interior (specifically the wall voids) without ever entering the house.  Technicians

9   instead inject the pesticide into the tubes through the exterior port on the home.

10   Conventional chemical pest control requires that the service technician enter the

11   home to spray the pesticide.

12      e.   **Security –** tube-in-the-wall pest control is much more secure than conventional

13   chemical pest control because servicemen never enter the home.

14      f.   **Environmentally responsible –** tube-in-the-wall pest control uses 75% less

15   pesticides, meaning less pesticides are put into the environment.  Conventional

16   chemical pest control must be done more frequently, and must be done in greater

17   quantities due to evaporation.

18      **D.**   **HomeTeam Controls the Market**

19      81.   From its earliest beginnings, HomeTeam and its predecessor sought to block all

20   companies from servicing tube-in-the-wall pest control without consent.

21      82.   For example, franchisees could compete in conventional pest control, but never in

22   tube-in-the-wall pest control without an agreement with HomeTeam's predecessor-in-interest

23   (ESSI).  ESSI offered franchisees the licensing rights to a patented system called "integrated pest

24   control" in 1993.  "Integrated pest control" was defined by ESSI as "any method of pesticide

25   application which utilizes tubes, pipes or other vessels installed behind or on the walls of a building

26   to transport and apply a pesticide."  (See, Exhibit 3, Excerpts from Pest Defense System, Direct

27   Franchise Agreement, at R05443.)  ESSI conditioned the use of the "integrated pest control"

28   patented technology on the franchisees not using any other "integrated pest control" services.  (Id. at

11

p. 5442, 5443, 5449, 5450.)  However, franchisees were permitted to offer "conventional pest control services" without any limitations.  (Id. at p. 5450.)  "Conventional pest control" was defined as "any method of pest control which does not employ an integrated pest control system."  (Id. at p. 5443.)

83.    ESSI quickly grew into a powerhouse for pest control, and about four years after starting to franchise, a national builder (Centex Homes) expressed interest in purchasing the company.  This resulted in a sale of the tube-in-the-wall technology to ESSI.

84.    Between April 1996 and May 1997, Centex Homes acquired the patent to the tube-in-the wall pest control and then purchased nearly every franchise company previously licensed by ESSI to install tube-in-the-wall systems.  Centex merged all of the companies into one company that operated under the HomeTeam name.

85.    HomeTeam began installing tube-in-the-wall systems into homes built by Centex as part of Centex's standard tract home features.

86.    HomeTeam, as part of the servicing market, would then seek out business to service previously installed tube-in-the-wall systems and tube-systems installed in the new Centex homes after the new homeowners moved into the home.

87.    HomeTeam further blocked other companies from servicing the systems.

88.    On May 10, 2004, HomeTeam filed a sham lawsuit suit to block a former employee from servicing tube systems.  (See, Exhibit 4, *HomeTeam Pest Defense, LLC v. Platinum Pest Services, Inc.*, U.S. District Court, Middle District of Florida, (Case No. 6:04-cv-689-Orl-28JGG)).  HomeTeam alleged in its complaint that it "provides pest control systems to homeowners . . . that consist of perforated tubes in the walls, and/or under the foundation slabs, of new homes.  HomeTeam secures and maintains ownership of portions of these systems, and contracts with homeowners to provide pest control services by injecting insecticide into the systems through external service ports."  (Exhibit 4 at ¶ 7.)

89.    HomeTeam further alleged that the Platinum Defendants "actively induced one or more homeowners to use Defendants' pest control and termite control services instead, causing injury to HomeTeam.  Moreover, on information and belief, when Defendants provide services to

those homeowners, it exercises control over HomeTeam's personal property in a manner inconsistent with HomeTeam's rights."  (Id. at ¶ 19.)  HomeTeam further complained about the promotion of Defendants' ability to service these systems.  (Id. at ¶¶ 22, 31.)

90.     On June 8, 2005, the Platinum entered a judgment enjoining it from:  "touching, injecting, shooting, coming in contact with or providing any pest control services involving any HomeTeam pest control system that includes tubing within wall voids or under slabs."  The Defendants were also enjoined from "infringing (directly, contributorily, or otherwise) United States Patent No. 5,347,749 in any way." (See, Exhibit 5.)

91.     HomeTeam kept this competitor out of servicing despite the lawful nature of another company servicing a patented product.

**E.     HomeTeam Creates Locking Device to Block Servicing by Competitors**

92.     In the first decade of its operations, ESSI and HomeTeam utilized port covers that allowed any pest control company to access the system.

93.     The old port covers looked similar to exterior covers and servicing panels used by electricians.  (See, Exhibit 6.)

94.     On May 18, 2004, just eight days after the filing of the lawsuit mentioned above against Platinum Pest Service – HomeTeam filed its provisional application for a patent for special locking port covers invented to prevent all competitors from servicing the integrated system. (See, Exhibit 7.)

95.      HomeTeam's senior executive (Jeryl Gahloff, Jr.) admitted to the U.S. Patent Office that the patent was designed to prevent anyone other than HomeTeam from providing service to these systems:

> "The externally accessible ports may be accessible to any suitable service provider, such as an exterminator, who may connect a device to the externally accessible ports to inject the material, such as pesticide, into the one or more cavities. *This may be undesirable if a particular service provider, such as may be associated with the construction of the structure, desires to be the exclusive provider of such services*."

> "According to the present invention, disadvantages and problems associated with previous techniques for preventing unauthorized access to ports of a system integrated into a structure for injection of a material into cavities in the

13

structure may be reduced or eliminated."

(See, id. at p. 3; *see also* US Patent No. 7,174,753, No. 7,415,855, No. 7,404307, and No. 7,900490 (emphasis added).)

96.     Jeryl Gahloff, Jr. also told the United States Patent Office that the locking device would provide evidence another company serviced the system:

> "Additionally, it may be desirable to *provide evidence* that a port cover for preventing such access to the ports has been forcibly breached. *These objectives may be desirable if a particular service provider* for injection of the material into the cavities *desires to control access to the ports.*"

(See, US Patent No. 7,174,754 at p. 3; *see also* US Patent No. 7,174,753, No. 7,415,855, No. 7,404,307, and No. 7,900490 (emphasis added).)

**F.     HomeTeam Misleads Homeowners**

97.     HomeTeam's senior executives admit that there were no safety risks or risks to the tube-in-the-wall system that justified locking this port covers. Indeed, there was no history of any damage to any tube-in-the-wall system and thus no risk to the homeowners by leaving the port unlocked.

98.     HomeTeam's California District Manager, Eric Chavez, also admitted under oath that there was no risk:

> Q. "So to have [the port] unlocked, it's not, like, increasing a greater risk for the homeowner?"
> A. "If it's unlocked?
> Q. "Right."
> A. *"There is no risk."*

(See, Deposition of Eric Chavez at 178:12–16 (emphasis added).)

99.     HomeTeam abused its superior knowledge and position to provide false and misleading information to customers who have no personal knowledge about tube-in-the-wall pest control system.

100.     HomeTeam misled customers into believing that service by any other company would damage the integrated tube-in-the-wall system. On each port cover, HomeTeam placed a warning stating Homeowners would lose the warranty for the entire tube-in-the-wall system running through

14

the walls of their home if there was any damage from "unauthorized service." (See, e.g., Exhibit 8, HomeTeam Labels.)

101.   HomeTeam had no reason to believe that other service providers had ever caused any damage to a tube-in-the-wall system, or that they would be likely to do so.

102.   Further, by referring to service by other companies as "unauthorized," HomeTeam misled the homeowners and gave the appearance that only one company had the legal ability to access the tube-in-the-wall system.

103.   HomeTeam would only remove the locked port covers if customers acknowledge that "[s]ervicing by anyone other than [HomeTeam] could damage the [tube-in-the-wall] system and possibly even damage your home."  (See, Exhibit 9.)

104.   HomeTeam also offered consumers a "100% Service Warranty" from HomeTeam. The warranty documents indicated that homeowners received a (1) "a warranty for workmanship," and (2) "a lifetime warranty on service when the system is activated by HomeTeam Pest Defense in the first year and continuously serviced thereafter."

105.   HomeTeam further notified competitors that HomeTeam owned all ports to the tube-in-the-wall systems installed on the homes *even after* the homes were lawfully purchased by Garnica, Potter, and other putative class members.

106.   HomeTeam, in other word, claims ownership in a fixture on the property – a property right that allegedly arose *prior* to the homeowner ever moving into the home.  HomeTeam did not disclose its ownership prior to the homeowner's purchase of the home.

107.   HomeTeam's claim of ownership and the right to exclude "unauthorized" service is contrary to any legal principle of homeownership or patent law.  Homeowners have an absolute legal right to obtain servicing of the tube-in-the-wall system by any company they choose.  There is no right for a holder of any patent – in this case a patent just for the port itself – to stop these homeowners for engaging another company to service the tube-in-the-wall pest control systems. See, e.g., Bowman v. Monsanto Co., 133 S. Ct. 1761, 1766 (2013) quoting Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 625, (2008)("the initial authorized sale of a patented item terminates all patent rights to that item."); see also United States v. Gen. Elec. Co., 272 U.S. 476,

15

489 (1926) ("It is well settled, as already said, that where a patentee makes the patented article, and sells it, he can exercise *no future control over what the purchaser may wish to do with the article after his purchase.* It has passed beyond the scope of the patentee's rights.") (emphasis added).

108.    Nonetheless, HomeTeam claimed control over these port covers from 2004 to at least 2013.  HomeTeam uses this so-called ownership as the grounds to bring sham legal actions against any competitor who attempts to service tube-in-the-wall pest control systems.  (See, Exhibits 4, 18 27.)  HomeTeam claims that it is unlawful for service providers to open or remove the locked port boxes.  Pest control competitors were even told that their "unlawful" actions subjected the homeowners – their customers—to patent infringement.

109.    Under oath, the California District Manager overseeing HomeTeam operations explained that HomeTeam viewed direct competition in the tube-in-the-wall system service market as improper because "there's still a brotherhood in pest control."  When asked, he explained that there is an understanding that no other "company [will be] touching our system."

110.    HomeTeam, under this District Manager, brought suit to stop a company that "touched" the HomeTeam system and offered to charge consumers less than HomeTeam charged. (Exhibit 27).

111.    These actions by HomeTeam prevented other pest control companies from entering the secondary market for servicing of tube-in-the-wall systems.

112.    As a result of HomeTeam's actions, customers with tube-in-the wall systems were forced to pay a higher monthly rate for the servicing of their tube-in-the-wall systems.  Upon information and belief, HomeTeam charged an additional 3 to $25 for a bi-monthly service beyond what other servicers would have charged to service the tube-in-the-wall systems.  Upon acquisition of these customers, HomeTeam anticipated it would maintain those relationships for anywhere from 8-20 years.

### G.    HomeTeam's Acquisition by Rollins

113.    HomeTeam's anticompetitive tactics were successful, turning HomeTeam into the third largest pest control service provider in the nation by 2008 (just twelve years after its acquisition of the technology for tube-in-the-wall pest control).  (See, Exhibit 14, Excerpts from Rollins' 2008

16

Annual Report at KPCI-000958.)

114.    HomeTeam's impressive financial performance and possession of monopoly in the tube-in-the-wall service market enticed Rollins into purchasing HomeTeam for $137 million in 2008.

115.    Before that deal was announced, Rollins conducted its due diligence beginning on November 6, 2007.

116.    Rollins reviewed a number of agreements that demonstrated how HomeTeam acquired and maintained its monopoly power in the tube-in-the-wall servicing market.

117.    For example, in the midst of the negotiations with Rollins, HomeTeam sold one or more branches to a Terminix licensee(s).  The sales agreement provided that Terminix must only use conventional pest control for those customers and could *not* service their tube-in-the-wall systems. The sales agreement specifically stated, "ten (10) Customer Agreements provide for Seller to perform Taexx pest control services to the customers thereunder.  Such Customer Agreements are included in the Assets, but Purchaser will be required to service those customers using conventional pest control methods, *not integrated (Taexx) pest control means*."  (Emphasis added.)

118.    The Terminix licensee also agreed to "either (a) convert all Taexx Customer Agreements to conventional pest control Customer Agreements or (b) advise all of the customers with Taexx Customer Agreements that Purchaser will not assume their Taexx Customer Agreements."

119.    Thus, the Terminix licensee would *never* be allowed to service any tube-in-the-wall pest control system of HomeTeam's former customers after Terminix otherwise acquired the pest control service relationship from HomeTeam.  (See, Exhibit 11, Purchase and Sale Agreement, Bates No. R04344-49, 4348, at ¶ 4.h. (3) (i).

120.    Rollins also received access to franchise agreements and buy-out agreements that included similar noncompetition clauses.  (See, Exhibit 3).

121.    By the time Rollins completed its due diligence for the sale of HomeTeam in early 2008, it received all assurances that HomeTeam would control servicing of all pre-existing tube-in-the-wall customers and all future customers.

17

122.    On March 31, 2008, Rollins announced that it acquired HomeTeam and gained immediate access to some 400,000 customers.  Gary Rollins, president and CEO of Rollins, described the acquisition as follows:

> "This acquisition provides significant opportunity for Rollins to *leverage HomeTeam's proprietary technology* and new home marketing expertise to more markets throughout the U.S.  The purchase of HomeTeam will provide us with an *entry into a new business channel*, and provide our company a meaningful opportunity for longer term growth."  (*See*, Exhibit 12, (emphasis added).)

123.    Rollins' 2008 Annual Report openly acknowledged to its shareholders that HomeTeam had achieved a monopoly in the servicing of all tube-in-the-wall pest control systems: Rollins reported that "all new homes" with tube-in-the-wall systems were "waiting to be serviced by HomeTeam *exclusively*."  (See, Exhibit 14 (emphasis added).)  Rollins, moreover, claims that 20% of all new homes in the geographic markets where HomeTeam operates included the tube-in-the-wall pest control system.  In other words, Rollins told its shareholders that HomeTeam had the exclusive right to service all of those customers.

124.    Following Rollins' acquisition, HomeTeam added a new method to obtain monopoly power in the servicing market.

125.    HomeTeam entered into agreements with national builders of tract houses to install the tube-in-the-wall system below cost.  In return, builders agreed to:  (1) provide a closing list and "completed first service certificate" to HomeTeam every 15 days; (2) utilize HomeTeam's "marketing program which includes use of the Company's service certifications," (3) permit HomeTeam "to provide sales training to Builder's sales group at least every ninety (90) days."  (See, e.g., Exhibit 16, Installation Agreement, Bates No. 444-447, at 446.)

126.    HomeTeam charged builders as little as $75 per house to install the tube-system, and in some cases, HomeTeam installed free of charge. (See, Exhibit 16 at 446, and Exhibit 30 at p. 2.) ("Pricing would typically be at the most at cost, but usually below cost.  Some national builders had installation of TAEXX for zero dollars.")   These prices fell far below all recent and historical prices. In comparison, at the time of the acquisition, Centex reported to Rollins that the price for installations in Bakersfield was $225.  (See, Exhibit 13.)

SECOND AMENDED COMPLAINT

127.     In exchange for below cost installations, builders agreed to assist HomeTeam in acquiring customers who hired HomeTeam to service the tube-in-the-wall systems.  HomeTeam could terminate the agreement if the builder's customer "Capture Rate" was less than 80%.

128.     The installation agreements defined "Capture Rate" as follows:

> "The percentage derived by dividing the number of Accepting Homebuyers by the number of Closings of Eligible Homes.  'Accepting Homebuyers' means the number of Builder's homebuyers who received their first [tube-in-the-wall] service during a calendar quarter.  'Closings of Eligible Homes' mean the number of closings (during the same quarter) of Builder's homes in which [tube-in-the-wall] systems are installed."  (See, Exhibit 16, Document Bates No. 446-447.)

129.     In its June 30, 2013 Quarterly Report to the United States Securities and Exchange Commission, Rollins admitted it installed below cost:  "*Management views the loss on installation as a customer acquisition cost* and a reasonable one at that."  (See, Exhibit 21 at KPCI-001566 (emphasis added).)  While selling below cost "hurts our margins in the short term. . . . it drives HomeTeam's future growth and profitability."  (Id.)

130.     As a result of the below cost installation, few companies, if any, can absorb the losses to compete against HomeTeam in the market for installation of tube-in-the-wall pest control systems.

131.     Despite dropping prices, Rollins and HomeTeam do not appear to have increased the geographic markets where they operated.  The most significant growth geographically took place during the franchising and Centex days (prior to Rollins' acquisition of HomeTeam).   Exhibit 1 demonstrates the locations of current HomeTeam operations.   This is very similar to the geographic spread at the time of the acquisition by Rollins of HomeTeam in 2008.  (See, Exhibit 13, Support Agreement at pp. 319-320 & 322-324.)

132.     Between the misrepresentations to homeowners and threats to competitors, HomeTeam enjoyed a benefit few companies enjoyed in 2008 – HomeTeam could increase its prices during a down economy and enjoy supracompetitive profits.

133.     In 2008, Rollins generated $1,020,564,000 in revenues including $98,931,000 of from the HomeTeam servicing revenue.

134.     Rollins proudly explained to its shareholders that it could obtain these profits in a

19

down economy as a result of a successful price increase program:

> "*Residential pest control revenues grew 22.7% in 2008 due primarily to the addition of HomeTeam* as well as an increased number of leads received, better average selling prices, improvements in customer retention, and a *successful price increase program*." (See, Exhibit 14).

135.    In 2009, Rollins further explained to its shareholders that HomeTeam's business model of applying "price realization" would continue to gain "strength from recurring revenues." (Exhibit 15 at KPCI-001071, 1072.)

**H.    After the Acquisition by Rollins, HomeTeam Maintains its Monopoly**

136.    After the Rollins' acquisition, below cost pricing was not the only step taken by HomeTeam to block competitors.

137.    On May 5, 2011, HomeTeam filed another sham lawsuit to block a former franchisee from installing or servicing tube-in-the-wall systems.  (Exhibit 18, *HomeTeam Pest Defense, Inc. v. Island Pest Control, Inc.*, Case No. 9:11-cv-1092-SB (United States District Court, S.C.).)

138.     HomeTeam claimed in the lawsuit that in 2005, HomeTeam bought out and terminated Island Pest Control's rights to service or install any tube-in-the-wall system.  (Exhibit 18, Complaint at ¶¶ 9-11, Ex. 1 at ¶ 7. e. i.)

139.    Island Pest Control thought there was a time limit on the noncompetition clause.  And five years later, Island Pest Control sent letters to customers offering to service tube-in-the-wall systems, and notifying customers that the "noncompete term has ended."  Island expressed pride in "adding the installation and quarterly service of Tubes-in-The-Wall back to that list."  (Exhibit 18, Complaint, Exh. 2.)

140.    HomeTeam's complaint against Island Pest Control claimed the use of the word "Tubes in the Wall" violated its registered trademark under the Lanham Act and further alleged Island breached its agreement not to compete in the servicing of tube-in-the-wall pest control. (Exhibit 18.)

141.    By July 14, 2011, HomeTeam forced Island to turn over its customer list and discontinue marketing tube-in-the-wall servicing.  (Exhibit 19,Consent Order for Injunctive Relief.)

142.    By November 22, 2011, Island exited the tubes-in-the-wall market for the second

time, agreeing to "cease involvement in the business of installing and repairing the Tubes In the Wall ® pesticide delivery systems."  (Exhibit 20, Consent Order for Partial Settlement at ¶¶ 3, 3.)

143.    HomeTeam attempted to do the same to Killian Pest Control, the only company in California that competes with HomeTeam to service tube-in-the-wall systems.

144.    Killian first entered the tube-in-the-wall pest control business in 1994.  (Exhibits 22 & 23).

145.    After Centex acquired the assets of ESSI between 1996 and 1997, HomeTeam demanded that Killian cease doing business of installation or servicing tube-in-the-wall systems: "effective immediately, to the extent you or any firm affiliated with you (collectively, the "LK Parties") have or had a Pest Defense franchise or license, such rights are hereby terminated and the LK Parties no longer have any rights or license to use any of ESI's patent technologies, including Tubes-In-The-Wall…"  (Exhibit 24.)

146.    The threats from HomeTeam started again in 2011 when HomeTeam told Killian to stop servicing the tube-in-the-wall systems.

147.    These threats led to attorney involvement on January 7, 2013, attorneys for HomeTeam then wrote to notify Killian of the following:

> "..I am advised that with respect to my client's Taexx® Built-In Pest Control System, hereafter 'Taexx System', you have been and are acting in an inappropriate manner with respect to the conduct of your firm's business operations.
>
> "This conduct includes . . . . making false, deceptive, unfair and misleading claims with respect to your firm's ability, right and/or entitlement to tamper with and destroy the ports on the Taexx System.  *These ports are the property of my client.*
>
> "You are wrongfully misleading customers who already own the Taexx System by stating that you have the right to remove the cover plate on the system and refill the pipes.
>
> "You have further acted wrongfully in that your representatives have, in fact, destroyed and removed the above-referenced ports without the consent or permission of my client. . .
>
> ***
>
> *"You are engaging in unfair price-cutting to obtain the business.*

21

"You are wrongfully misleading owners of the Taexx System that you are able to provide a Taexx-like system with the 'tubes in the wall' which you call Pest Guard. Since the tubes in the wall system is covered by multiple patents, you have reason to know that you cannot provide such a system without subjecting your potential customers with patent infringement for use of such an infringing system, never mind your own infringement.

"and your statements claiming that you can provide a 'tubes in the wall system in your sales literature is further false and deceptive advertising and *will violate one or more of the following patents if you attempt to install such a system:* U.S. Patent Nos. 7 415 855, 7 174 753, 7 174 754, 7 404 307, 5 347 749, and 5 819 466." (Id. at p. 3 (Emphasis added.))

"This is your final warning. Immediately cease your wrongful conduct as set forth herein. If you do not cease and desist, we will initiate legal action against you immediately and seek all appropriate relief and damages. This is not the first in a series of correspondence. Conduct yourself accordingly." (See, Exhibit 25.)

148.    There was one more letter, sent on March 20, 2013, wherein HomeTeam's attorneys reiterate that the letter was not "mere allegations and threats." HomeTeam further insisted that its "customer acknowledges that all Taexx System service ports and blank plates installed on the exterior of the property remain the property of my client at all times." (Exhibit 26, KPCI – 00015-17 at Numbered ¶ 5.)

149.    HomeTeam lived up to this assurance that the statements were not merely threats – it filed a Complaint against Killian Pest Control on June 17, 2013. (Exhibit 27.) HomeTeam focused on the following allegations of bad acts:

- Killian "*failed to advise the homeowners that the ports, which are owned by Plaintiff HOMETEAM, when tampered with or removed, and/or that the system when serviced by anyone other than Plaintiff HOMETEAM, results in a complete voiding of the warranty* provided by Plaintiff HOMETEAM to the homeowner." (Id. ¶ 13 (emphasis added).)

- "Beginning in a period no later than November 2012 and continuing thereafter, Defendant KILLIAN approached existing customers or potential customers of Plaintiff HOMETEAM with regard to the existing TAEXX SYSTEMS, and *offered them a lower monetary rate for the provision of pest control services with regard to the servicing of the TAEXX SYSTEMS.*" (Id. ¶ 15 (emphasis added).)

- HomeTeam alleged Killian's taking of these customer relationships

22

diverted "the sum of approximately $470 per year for annual service."  (Id. ¶ 20.)

- "As a proximate result of Defendant KILLIAN's publication of the statements, prospective customers have been deterred from doing business with Plaintiff HOMETEAM.. . .Plaintiff HOMETEAM has thereby suffered injury to its business…"  (Id. ¶ 15.)

150.    Killian filed a Cross-Complaint against HomeTeam on August 22, 2013, seeking recovery under state competition laws for HomeTeam's actions.  (See, Exhibit 28.)

151.    During litigation, HomeTeam substantially limited its production of documents and discovery responses, excluding much information about activities outside of Kern County.

152.    This led to the filing of a Motion to Compel by Killian against HomeTeam.

153.    At the hearing, on June 23, 2014, the state court expressed concern about the reach of original complaint outside of Kern County and took the matter under submission.  The state court indicated in its tentative opinion that it would likely grant in part and deny in part the motion to compel.

154.    On July 3, 2014, before a final ruling on the motion to compel, Killian filed a motion to amend the complaint to fully state its potential claims in an effort to resolve the state court's concerns about the scope of the pleadings.

155.    On July 14, 2014, the state court adopted its tentative and granted in part and denied in part discovery.  The Court limited the obligation of HomeTeam to respond to discovery as to "Kern County only."  (See, Exhibit 29.)

156.    On July 28, 2014, before the hearing date on Killian's motion to file an amended cross-complaint, HomeTeam dismissed its lawsuit against Killian.

157.    Killian then dismissed its Cross-Complaint to avoid any dispute about the extraterritorial reach of the antitrust claims.  (See, Exhibit 31.)

158.    Killian also notified HomeTeam of his intent to file in Federal Court to avoid dispute about the scope of the Cartwright Act as to actions and markets outside of California.

159.    This led to the Killian's filing of the Sherman Act claim, to avoid any disputes about the geographic reach of either the discovery laws or antitrust laws.  The parallel case filed by Killian

1    is brought in this Court under the case number 14-cv-05239-VC.

2         160.    By leveraging its complete power in the installation market, along with removing

3    competitors in the servicing market, HomeTeam created an unlawful monopoly in the service for

4    tube-in-the-wall pest control.  HomeTeam thereby continues to earn monopoly revenues without

5    interruption from all homes with tube-in-the-wall systems. Thus, HomeTeam has not only violated

6    the antitrust laws but has collected monopoly revenues from consumers, which the law is designed to

7    prevent.

8         161.    HomeTeam and Rollins used its anti-competitive policies and practices in all

9    geographic areas where HomeTeam operates including California (Bakersfield, Riverside, San

10   Diego, and Sacramento), Arizona (Phoenix), Missouri (St. Louis), Nevada (Las Vegas), New

11   Mexico (Albuquerque), and Texas (Austin, Dallas, Houston, San Antonio), and in its East Division

12   Operations in Florida (Ft. Myers, Melbourne, Sarasota, Orlando, Jacksonville, Tampa, West Palm

13   Beach), Georgia (Atlanta, Savannah), Maryland (Hagerstown and Silver Spring), North Carolina

14   (Charlotte, Greensboro, Winston-Salem, Raleigh), South Carolina (Charleston, Myrtle Beach, Hilton

15   Head), Tennessee (Nashville), Virginia (Alexandria, Chester & Richmond, Manassas), and West

16   Virginia (Charles Town).

17   **II.    Summary of HomeTeam's Anticompetitive Conduct**

18        162.    Rollins' and HomeTeam's anticompetitive business practices violate the Sherman Act

19   in all states where they service tube-in-the-wall pest control systems.  As a result, Class Members

20   were charged more for servicing than they would have been charged in a competitive market.

21        163.     HomeTeam acquired the patent and all franchises licensed to do tube-in-the-wall pest

22   control, and then HomeTeam wrongfully brought suit against competitors seeking to service those

23   tube-in-the-wall systems at lower prices.  As one example, HomeTeam sued Killian Pest Control in

24   *Killian Pest Control v. HomeTeam Pest Defense*, Case Number S-1500-CV-279644 in Kern County

25   Superior Court on June 17, 2013. Killian Pest Control defended and HomeTeam dismissed the suit.

26   Killian Pest Control is filing a separate claim for antitrust violations against HomeTeam for

27   excluding it from the tube-in-the-wall servicing market.

28        164.     HomeTeam further developed a patent to lock competitors out of the tube-in-the-wall

24

system. HomeTeam then withheld the key to port from the homeowners with tube-in-the-wall systems to prevent them from choosing another pest control service provider tube-in-the-wall pest control. This key was the only key that new homeowners did not receive upon closing.

165.    HomeTeam further deceived Homeowners by suggesting that other competitors would damage the tube-in-the-wall system, and warranties for workmanship and servicing would become void if the homeowner used any other service provider.

166.    HomeTeam, under the Rollins umbrella, installed tube-in-the-wall systems below cost, and thus prevented other companies from being able to enter the installation market. HomeTeam also obtained exclusive access to the builder's list of customers and a captive audience of homeowners.

167.    HomeTeam further stifled competition by telling competitors that HomeTeam owned the system and by threatening patent litigation if the competitor offered tube-in-the-wall pest control. Yet the patent for the system expired in 2007 – the only active patents were those patents for the locking port covers, which were intentionally designed to keep competitors out. If the threats did not work, HomeTeam would sue the competitors to stop them. These bogus legal actions were executed for the sole purpose to intimidate and harass competitors.

168.    HomeTeam also entered into noncompetition agreements with other pest control service providers to allocate the tube-in-the-wall pest control market. In this way, HomeTeam has established that pest control service providers in its so-called "brotherhood" would not compete with HomeTeam in the tube-in-the-wall servicing market.

**III.    Relevant Market**

169.    As described in more detail above, the relevant market is the downstream market for tube-in-the-wall servicing. The California District Manager claimed the industry is a "brotherhood," and HomeTeam does not expect anyone else to do the servicing.

170.    Based upon discovery to-date, HomeTeam controls nearly 100% of the market for servicing of tube-in-wall pest control systems.

171.    HomeTeam relied upon economies of scale and funding from Rollins to further buttress the monopoly. HomeTeam now enjoys supracompetitive profits and the ability to

1   successfully increase prices in a down economy.[1]  As recently as 2012, Rollins assured its

2   shareholders that they "provide essential services with recurring revenue and participate in a

3   virtually recession-resistant business."[2]

4       172.    Beginning in 2008, Rollins told its shareholders that HomeTeam "services home

5   builders nationally."[3]  HomeTeam's headquarters does planning for its multi-state market of the

6   servicing of tube-in-the-wall systems.  HomeTeam's headquarters sets prices, rates, and terms for the

7   servicing of tube-in-the-wall systems.

8       173.    The precise contours of the relevant geographic markets, however, likely correspond

9   to the areas of service for HomeTeam's individual office providers of such servicing.  Attached as

10  Exhibit 1 is a map of the Metropolitan and Micropolitan statistical areas of the United States and

11  Puerto Rico, with the relevant geographic markets highlighted in red.  The geographic market is

12  further described in more detail below.

13      174.    In addition, as detailed in the attached expert declaration from Dr. Tracey Lewis, the

14  geographic markets align with certain individual Metropolitan and/or Micropolitan Statistical Areas

15  ("MSAs") and/or Combined Statistical Areas ("CSAs") as defined respectively by the United States

16  Bureau of the Census and the United States Office of Management and Budget, in which HomeTeam

17  operates and in which its tube-in-the-wall servicing customers are located.  (See, Exhibit 2 at p. 17).

18  MSAs consist of a core area containing a substantial population nucleus, together with adjacent

19  communities having a high degree of economic and social integration with that core (e.g., the

20  Bakersfield, CA MSA, which is defined as Kern County).  A CSA in turn consists of a grouping of

21  certain adjacent MSAs that have strong interconnections (e.g., the San Francisco, CA-San Jose, CA-

22  Oakland, CA CSA).  The individual geographic markets for servicing of the tube-in-the-wall system

23  may include, in addition to HomeTeam and other national competitors, regional firms who are

24  willing to service tube-in-the-wall systems but have been unable to enter the market due to

25  HomeTeam's monopolization of the service market.  The specific MSAs and CSAs in which

27  [1] See, Exhibit 14, Rollins 2008 Annual Report to Shareholders at p. 26.
28  [2] See, Exhibit 32, Rollins 2012 Annual Report to Shareholders at p. 3.
    [3] See, Exhibit 14, Rollins' 2008 Annual Report at pp. 15, 54.

SECOND AMENDED COMPLAINT

HomeTeam operates, and in which HomeTeam's customers are located, may be adduced through discovery and additional expert analysis.

175.    The servicing in question must be physically provided by HomeTeam to the customer, at that customer's home address.  Individual servicing visits generate approximately $100 in revenue for HomeTeam.[4]  (See, Exhibit 2 at p. 15)  This suggests that individual servicers will probably not want to drive very long distances to deliver the service, but given the only potential customers must have the tube system installed, there will be some geographic overlap with the installation market.[5]  (Id.)

176.    The service radii for HomeTeam's 36 individual-office service areas vary somewhat, as would be expected given region-to-region variation in local traffic patterns as well as concentrations of tract home developments with pre-installed tube-in-the-wall systems. (Id.) However, HomeTeam's individual offices appear to offer TIW servicing within a radius of anywhere from about 15-20 miles up to about 50 miles.  (Id.)

177.    It is no coincidence that the individual regional geographic markets for HomeTeam's services correspond to one or more of the specific metropolitan "statistical areas" that have been defined by the United States Government's Office of Management and Budget ("OMB").  The OMB has developed these metropolitan-region concepts (specifically, the individual Metropolitan and Micropolitan Statistical Areas; which about half of the time are consolidated into the larger regions called Combined Statistical Areas) based on its understanding of driving distances and time (observed from commuting patterns) as well as the "broader social and economic interactions" that may pertain to economists' analyses of regional economic activity.[6]

---

[4] In 2013, HomeTeam's per-servicing prices for homes in the Bakersfield, California area ranged from $67 to $91 (Exhibit 59 to the February 20, 2014 Deposition of Matthew Turek, plus pp. 183-185 of that deposition).

[5] For example, Mr. Killian would not be willing to drive from his base in Kern County (southern central California) to Redding (far northern California) to deliver this service (Deposition of Larry Killian, April 2, 2014, pp. 55-56).

[6] According to the OMB, there are a total of 929 Metropolitan and Micropolitan Statistical Areas in the United States and Puerto Rico.  For example, one is the "Bakersfield, CA Metropolitan Statistical Area" that consists of Kern County.  Of these 929, the OMB identifies 524 that it further combines into a total of 169 distinct Combined Statistical Areas.  This information is detailed in OMB Bulletin No. 13-01, February 28, 2013 (entitled "Revised Delineations of

178.    The demonstrated economic interconnectedness of the OMB's Statistical Areas, together with the correspondences between those areas and HomeTeam's 36 individual-office service areas (and the separate correspondence between Killian's service area and the Bakersfield, California Metropolitan Statistical Area) demonstrate a natural approach to geographic market definition for TIW servicing.  First, for those offices that are located within an OMB-defined Combined Statistical Area, the entire Combined Statistical Area would be a conservatively-defined geographic market.[7]  Second, for those offices whose service areas are not entirely located within a single Combined Statistical Area, the geographic market would be defined as the collected set of individual Metropolitan and/or Micropolitan Statistical Areas within which the office provides TIW servicing.

179.    Based on these definitions and all the evidence currently available, as described by Dr. Lewis, the 36 relevant geographic markets for the servicing of tube-in-the-wall systems are:

1. Albuquerque-Santa Fe-Las Vegas, NM Combined Statistical Area

2. Atlanta--Athens-Clarke County--Sandy Springs, GA Combined Statistical Area

3. Austin-Round Rock, TX Metropolitan Statistical Area

4. Bakersfield, CA Metropolitan Statistical Area

---

Metropolitan Statistical Areas, Micropolitan Statistical Areas, and Combined Statistical Areas, and Guidance on Uses of the Delineations of These Areas"):

- "Metropolitan Statistical Areas have at least one urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties."

- "Micropolitan Statistical Areas have at least one urban cluster of at least 10,000 but less than 50,000 population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties."

- "Combined Statistical Areas can be characterized as representing larger regions that reflect broader social and economic interactions, such as wholesaling, commodity distribution, and weekend recreation activities, and are likely to be of considerable interest to regional authorities and the private sector."

[7] In theory, one could posit alternative, narrower geographic market definitions that would apply to sub-regions within a Combined Statistical Area, consisting only of those specific Metropolitan and/or Micropolitan Statistical Areas that the local HomeTeam office specifically serves.  However, to make refinements along these lines, one would need additional information from HomeTeam on (for example) its office-specific service records, and/or the company's ZIP code lookup database as mentioned above, and/or other information from individual HomeTeam office leaders as to the specific geographic range of TIW servicing that they are willing to provide.

5.  Cape Coral-Fort Myers-Naples, FL Combined Statistical Area

6.  Charleston-North Charleston, SC Metropolitan Statistical Area

7.  Charlotte-Concord, NC-SC Combined Statistical Area

8.  Dallas-Fort Worth, TX-OK Combined Statistical Area

9.  Fayetteville-Lumberton-Laurinburg, NC Combined Statistical Area

10. Gainesville-Lake City, FL Combined Statistical Area *plus* Ocala, FL Metropolitan Statistical Area

11. Greensboro--Winston-Salem-High Point, NC Combined Statistical Area

12. Greenville-Spartanburg-Anderson, SC Combined Statistical Area

13. Washington-Baltimore-Arlington, DC-MD-VA-WV-PA Combined Statistical Area

14. Hilton Head Island-Bluffton-Beaufort, SC Metropolitan Statistical Area

15. Houston-The Woodlands, TX Combined Statistical Area

16. Jacksonville-St. Marys-Palatka, FL-GA Combined Statistical Area

17. Killeen-Temple, TX Metropolitan Statistical Area *plus* Waco, TX Metropolitan Statistical Area

18. Lakeland-Winter Haven, FL Metropolitan Statistical Area *plus* Wauchula, FL Micropolitan Statistical Area *plus* Sebring, FL Micropolitan Statistical Area

19. Las Vegas-Henderson, NV-AZ Combined Statistical Area

20.  Miami-Fort Lauderdale-West Palm Beach, FL Combined Statistical Area *plus* Palm Bay-Melbourne-Titusville, FL Metropolitan Statistical Area *plus* Sebastian-Vero Beach, FL Metropolitan Statistical Area

21. Myrtle Beach-Conway, SC-NC Combined Statistical Area

22. Nashville-Davidson-Murfreesboro, TN Combined Statistical Area

23. North Port-Sarasota, FL Combined Statistical Area

24. Orlando-Deltona-Daytona Beach, FL Combined Statistical Area

29

25. Panama City, FL Metropolitan Statistical Area *plus* Pensacola-Ferry Pass-Brent, FL Metropolitan Statistical Area *plus* Crestview-Fort Walton Beach-Destin, FL Metropolitan Statistical Area

26. Phoenix-Mesa-Scottsdale, AZ Metropolitan Statistical Area

27. Raleigh-Durham-Chapel Hill, NC Combined Statistical Area

28. Riverside-San Bernardino-Ontario, CA Metropolitan Statistical Area

29. Sacramento-Roseville, CA Combined Statistical Area

30. San Antonio-New Braunfels, TX Metropolitan Statistical Area

31. San Diego-Carlsbad, CA Metropolitan Statistical Area

32. San Jose-San Francisco-Oakland, CA Combined Statistical Area

33. St. Louis-St. Charles-Farmington, MO-IL Combined Statistical Area

34. Tampa-St. Petersburg-Clearwater, FL Metropolitan Statistical Area

35. Tucson-Nogales, AZ Combined Statistical Area

36. Virginia Beach-Norfolk, VA-NC Combined Statistical Area *plus* Richmond, VA Metropolitan Statistical Area

(See Exhibit 2.)

## CLASS ACTION ALLEGATIONS

180.     Plaintiffs' action is brought on behalf of themselves and all others similarly situated. Plaintiffs seek to represent:

> All individuals who lived in a home with a tube-in-the-wall pest control system serviced by HomeTeam at any time from November 26, 2010 to the date of trial of this action.

181.      Federal Rule of Civil Procedure 23(a) establishes four threshold requirements for class certification:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.  Fed.R.Civ.P. 23(a).

182.      This action satisfies the numerosity, commonality, typicality, and adequacy

1    requirements of Rule 23(A)(1)-(4) and the predominance and superiority requirements of Rule

2    23(b)(3) and the requirements of Rule 23(b)(2).

3    183.    Class certification under Rule 23(b)(2) is appropriate because Defendants have acted

4    and refused to act on grounds generally applicable to the Class, thereby making appropriate final

5    injective relief or corresponding declaratory relief with respect to the Class as a whole.  Fed.R.Civ.P.

6    23(b)(2).

7    184.    Class certification under Rule 23(b)(3) is appropriate because common questions of

8    law and fact predominate and a class action is superior to other forms available for fair and efficient

9    adjudication of the claims of this action.  Fed.R.Civ.P. 23(b)(3).

10   185.    The Plaintiff Class satisfies the numerosity standards.  The Class is believed to

11   number in the hundreds of thousands.  As a result, joinder of all Class members in a single action is

12   impracticable.  HomeTeam reported having approximately 400,000 customers at the time Rollins

13   acquired its customer relationships in 2008 and added over 100,000 since that time.  The exact

14   number can be easily determined by obtaining records from Rollins or HomeTeam.

15   186.    There are questions of fact and law common to the Class which predominate over any

16   questions affecting only individual members.  The questions of law and fact common to the Class

17   and arising from Defendants' actions include, without limitation, the following:

18          a.    Whether Defendants committed acts designed to create a monopoly in the
19                servicing of tube-in-the-wall systems in violation of the federal antitrust laws;

20          b.    Whether Defendants acts designed to create a monopoly damaged consumers by
21                increasing the prices of servicing tube-in-the-wall systems above the prices
22                which would be found in a competitive market;

23          c.    Whether Defendants' conduct constituted unlawful business acts or practices in
24                violation of Section 2 of the Sherman Act, 15 U.S.C. 2;

25          d.    Whether HomeTeam's patented locking devices were improperly designed to
26                and did prevent homeowners from obtaining services for tube-in-the-wall pest
27                control by other pest control companies in violation of the Sherman Act;

28          e.    The appropriate measures of damages and other relief.

187.    Common questions predominate over individual ones.

188.    Plaintiffs, as the Class representatives, are asserting claims and defenses typical of the rest of the Class.

189.    Plaintiffs, as the Class representatives, will fairly and adequately represent the interests of the Class.  Plaintiffs have the same causes of action as the other Class members and do not have interests adverse to them.  Plaintiffs are committed to vigorously prosecuting this lawsuit and have retained experienced counsel for this purpose.

190.    Plaintiffs are aware of no difficulty that will be encountered in the management of this litigation that would preclude maintaining this national Class action.

191.    The names and addresses of potential Class members can be obtained from Defendants.  Notice can be provided to the members of the Class via first class mail or as otherwise directed by this Court.

## JURISDICTION

192.    This complaint alleges violations of the Sherman Act, 15 U.S.C. §§ 1, 2.

193.    It is filed under, and jurisdiction is conferred upon this Court by, Sections 4, 4C, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 22, and 26.  All claims under federal law are based upon a common nucleus of operative facts and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

194.     The Court further has jurisdiction over the federal claims under 28 U.S.C. sections 1331 and 1337.

## INTRADISTRICT ASSIGNMENT

195.    Venue is proper in this district pursuant to 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391 because Defendants transact business in this district, Defendants have offices in this district, and a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anticompetitive effects in this district.

## FIRST CAUSE OF ACTION

### Violation of the Sherman Act Section 2, 15 U.S.C. 2

196.    Plaintiffs allege and incorporate by reference each and every allegation contained above as though fully set forth herein.

197.    HomeTeam and Rollins unlawfully attempted to monopolize and achieved monopoly power in the tube-in-the-wall service market.  Specifically, HomeTeam and Rollins (i) entered agreements with builders to install tube-in-the-wall systems and thereby obtain confidential information about the sale of new homes with this system; (ii) sold installation services at a loss to achieve its anticompetitive goal of precluding competitors from entering the installation market and then blocking them in litigation from servicing homeowners with tube-in-the-wall systems; (iii) marketed to a captive audience with materials that suggest that only one company has the legal right or ability to safely service the pest control system; (iv) obtained agreements that suggest that HomeTeam was and will always be the owner of fixtures on the home with the tube-in-the-wall system; (v) provided knowingly false statements to potential customers related to competitor's inability to perform service to the tube-in-the-wall system; (vi) harassed, intimidated, and pursued sham litigation against competitors for the purpose of intimidating competitors into leaving the market and to stop them from charging lower prices; (vii) threatened to void warranties to Homeowner's tube-in-the-wall system; and (viii)  entered agreements with competitors to allocate the market.   These actions were done with the purpose of obtaining a monopoly power and had no appropriate or legitimate business justification.

198.    HomeTeam and Rollins' unlawful acts to restrain trade has excluded competition, denied consumers their right to choose their pest control service provider, and increased prices for tube-in-the-wall services.

199.    Plaintiffs have been injured in fact by these unlawful acts because they paid higher prices than they would have paid in a competitive market.  As a result of HomeTeam's actions, customers with tube-in-the wall systems were forced to pay a higher monthly rate for the servicing of their tube-in-the-wall systems.  Upon information and belief, HomeTeam charged an additional $3-25 per month beyond what other servicers would have charged to service the tube-in-the-wall

1  | systems.

2  |     200.    Plaintiffs have suffered injury as a direct and proximate result of Defendants'

3  | unlawful acts, and Defendants are therefore liable for all remedies provided including treble

4  | damages, interest, injunctive relief, costs and attorney's fees in amounts to be proved at trial.

5  |     201.    Defendants' unlawful monopolization of the tube-in-the-wall service markets violates

6  | the Sherman Antitrust Act, 15 U.S.C 2, and its unlawful monopolization practices are continuing and

7  | will continue unless they are permanently enjoined. No elaborate industry analysis is required to

8  | demonstrate the anticompetitive nature of this conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants.

1. Plaintiffs request that the Court adjudge and decree that:

    a.  The conduct alleged herein constitutes an illegal restraint of interstate trade and commerce in violation of the Sherman Act.

2. Plaintiffs also seek an order permanently restraining and enjoining Defendants from continuing the unfair and anticompetitive activities alleged herein;

3. Plaintiffs also seek damages in a sum to be determined according to proof at trial, including treble damages pursuant to statute and:

    a.  Prejudgment interest at the legal rate;

    b.  Attorney's fees including fees;

    c.  Costs of suit herein incurred; and

    d.  Such other and further relies as the court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.

Date: July 7, 2015

R. REX PARRIS LAW FIRM

By _____

Patricia K. Oliver
Attorneys for Plaintiffs